TRACY L. WILKISON
Acting United States Attorney
JERRY C. YANG
Assistant United States Attorney
Chief, Riverside Branch Office
JULIUS J. NAM (Cal. Bar No. 288961)
Assistant United States Attorney
Riverside Branch Office
    3403 Tenth Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6942
    Facsimile: (951) 276-6202
    E-mail:   julius.nam@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED CR No. 21-123-JFW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ANGEL RAMOS-CORRALES; EXHIBIT 1 |
| v. | |
| ANGEL RAMOS-CORRALES, | Hearing: November 1, 2021, 10 a.m. |
| Defendant. | Location: Courtroom of the Honorable John F. Walter |

     Plaintiff United States of America, through its counsel of
record, the Acting United States Attorney for the Central District of
California and Assistant United States Attorney Julius J. Nam, hereby
submits its sentencing position for defendant ANGEL RAMOS-CORRALES.
The government's sentencing position is based upon the attached
memorandum of points and authorities, the files and records in this
case, the Presentence Investigation Report submitted by the United
States Probation Office, and any other evidence or argument that the
Court may wish to consider at the time of sentencing.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The government respectfully requests the opportunity to supplement its position or respond to defendant as may become necessary.

Dated: October 17, 2021          Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 JERRY C. YANG
                                 Assistant United States Attorney
                                 Chief, Riverside Branch Office


                                    /s/
                                 _____
                                 JULIUS J. NAM
                                 Assistant United States Attorney
                                 Riverside Branch Office

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.    INTRODUCTION....................................................1

II.   DEFENDANT'S OFFENSE CONDUCT.....................................1

III.  A BRIEF HISTORY OF 18 U.S.C. § 48..............................3

IV.   THE PRESENTENCE INVESTIGATION REPORT...........................6

V.    THE GOVERNMENT'S SENTENCING CALCULATIONS AND
      RECOMMENDATIONS................................................8

      A.    Identification of the Correct Guidelines Calculation
            Method..................................................8

      B.    18 U.S.C. § 3553(a) Considerations......................11

            1.    Nature and Circumstances of the Offense...........11

            2.    History and Characteristics of Defendant..........12

            3.    Adequate Deterrence and Protection from Future
                  Crimes............................................15

            4.    Avoiding Unwarranted Sentence Disparities.........17

VI.   CONCLUSION.....................................................18

# TABLE OF AUTHORITIES

**CASES**

Miller v. California, 413 U.S. 15 (1973)............................5

United States v. Berry, No. 09-CR-30101-MJR
     (S.D. Ill. May 11, 2010)....................................16

United States v. Cantrell, 433 F.3d 1296 (9th Cir. 2006)..........11

United States v. Jacobs, 7:12-cr-84 (E.D.N.C. Mar. 6, 2013).......10

United States v. Krystal Cherika Scott, 21-49-SEB-DLP
     (S.D. Ind.)..............................................4, 8

United States v. Lee, 3:11-cr-30092 (S.D. Ill. Nov. 17, 2011)......10

United States v. McCoy, No. 4:17-cr-40009
     (C.D. Ill. Sep. 26, 2017)..................................10

United States v. Richards, 755 F.3d 269 (5th Cir. 2014)............5

United States v. Stevens, 559 U.S. 460 (2010).....................4

United States v. Treadwell, 593 F.3d 990 (9th Cir. 2010)..........17

**STATUTES**

18 U.S.C. § 2703..................................................2

18 U.S.C. § 3143(a)...............................................1

18 U.S.C. § 3553(a)..........................................passim

18 U.S.C. § 3581..................................................7

18 U.S.C. § 3583..................................................7

18 U.S.C. § 48...............................................passim

California Penal Code § 21810.....................................3

**OTHER AUTHORITIES**

USSG § 2E3.1.................................................passim

USSG § 2G3.1.................................................passim

USSG § 2X5.1.................................................passim

USSG § 3E1.1................................................7, 9

USSG § 5K2.0.....................................................10

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.   INTRODUCTION**

3       On June 3, 2021, defendant ANGEL RAMOS-CORRALES ("defendant")

4  entered a plea of guilty to the charge of Animal Crushing in

5  violation of 18 U.S.C. § 48(a)(1).  (Dkt. 24.)  After accepting

6  defendant's guilty plea, on June 14, 2021 the Court revoked

7  defendant's bond upon a finding that defendant was unable to meet, by

8  clear and convincing evidence, that he was not likely to flee or pose

9  a danger to the safety of any other person or the community if he

10 remained released on bond under 18 U.S.C. § 3143(a).  (Dkt. 33.)  In

11 reaching that decision, the Court relied in part on defendant's entry

12 of a guilty plea to a violent conduct and his repeated violations of

13 persistent marijuana use and failure to report for drug testing while

14 released on bond.  (Dkt. 15, 26.)

15      On August 30, 2021, the United States Probation and Pretrial

16 Services Office ("USPO") disclosed a sentencing recommendation letter

17 ("USPO letter") and a presentence investigation report ("PSR") in

18 this case.  (Dkt. 37, 38.)  The USPO recommended a sentence of 30

19 months in prison, after an upward variance, and two years of

20 supervised release with a mental health evaluation and treatment

21 condition.  (USPO letter at 1.)

22      Consistent with the plea agreement, the government recommends a

23 sentence of 24 months and no higher, followed by three years of

24 supervised release with the same condition recommended by the USPO.

25 **II.  DEFENDANT'S OFFENSE CONDUCT**

26      Defendant's offense of conviction was a gruesome act of

27 violence, which he committed with wanton disregard of the life of his

28 puppy, Canelo.  By the very nature and circumstances of defendant's

1  violent offense, he has shown himself to be capable of "cold-hearted"
2  cruelty, as he himself admitted.  (PSR ¶ 10.)

3      As he admitted in his plea agreement, on February 13, 2021
4  defendant first "inflicted severe injuries to Canelo's head and
5  torso, causing skull and rib fractures, which then caused Canelo to
6  fall continuously, unable to control his legs."  (Plea Agreement
7  (Dkt. No. 17) ¶ 9.)  While Canelo kept falling head first from his
8  injuries inside defendant's residence, defendant recorded a video of
9  Canelo and posted it on his account on Instagram, an Internet social
10 media application, to show his followers (id.; PSR ¶ 8), attaching to
11 that video another video of himself smiling and apparently drinking
12 shots of alcohol.

13     Defendant next "slit Canelo's throat by approximately 4.4
14 centimeters (or approximately 1.7 inches), causing Canelo to bleed
15 significantly and fall into a nonresponsive physical state."  (Plea
16 Agreement ¶ 9; PSR ¶ 9.)  Defendant again took a video of Canelo and
17 shared it this time on Snapchat, another Internet social media
18 application, which was viewed by several of defendant's Snapchat
19 friends, including one who viewed it from Mexico and transmitted a
20 recording of the video to another person in California.  (Id.)

21     While recording the second video, defendant narrated his
22 thoughts to his would-be viewers: "I just smoked his little ass. . .
23 . I'm cold-hearted, homie. Check this shit out, homie," after which
24 he swiftly kicked Canelo's head, causing Canelo's body to swivel and
25 jerk back by about a body's length.  (Plea Agreement ¶ 9; PSR ¶ 10.)
26 Defendant then declared: "Mo-fucker's dead."  (Id.)  According to the
27 records obtained from Instagram and Snap pursuant to warrants issued
28 under 18 U.S.C. § 2703, the Instagram video was uploaded at

approximately 4:30 p.m., while the Snapchat video was uploaded at approximately 6:40 p.m.[1]

At approximately 8:00 p.m. on the same day, after receiving a report of defendant's conduct, officers of the Riverside Police Department ("RPD") went to defendant's residence and met defendant who was discovered to be in possession of a brass knuckle, in felony violation of California Penal Code § 21810.  (Complaint (Dkt. No. 1) ¶ 13(f).)  RPD officers conducted a <u>Mirandized</u> interview of defendant at the residence, during which defendant claimed that he had smoked marijuana all day and referred to himself as a "cold-blooded killer." (<u>Id.</u> ¶ 13(j).)  Subsequently, Riverside County Department of Animal Services took custody of Canelo, and a veterinarian determined that Canelo was still alive but nonresponsive and suffering from severe blunt trauma on both sides of the head and face with fractures to the skull, a deep and clean-cut laceration of the neck on the jugular region measuring 4.4 centimeters, a left rib fracture, and rhythmic tremors affecting all four legs – compelling the veterinarian to euthanize Canelo due to the severity of the injuries.  (Plea Agreement ¶ 9; PSR ¶ 12.)

**III. A BRIEF HISTORY OF 18 U.S.C. § 48**

Section 48 of Title 18 of the United States Code has had four major revisions, the last of which added § 48(a)(1), the provision to which defendant has pleaded guilty, in 2019.  Because § 48(a)(1) was

---

[1] On June 13, 2021, the government lodged, under seal, copies of the Instagram and Snapchat videos with the court as Exhibits 1-8, as well as a declaration description the exhibits, in support of the government's brief seeking defendant's detention pending sentencing. (Dkt. 30-32.)  The government incorporates by reference those videos marked as Exhibits 1-8 as well as the declaration (Dkt. 30) describing those exhibits.

3

1  enacted after the last revision to the United States Sentencing
2  Guidelines in 2018 and it appears that this is the first case in
3  which a defendant will be sentenced under § 48(a)(1),[2] the government
4  provides a summary of the history of § 48 for relevant context.

5      Section 48 was first enacted in 1999.  Defining "animal cruelty"
6  as conduct "in which a living animal is intentionally maimed,
7  mutilated, tortured, wounded, or killed," the 1999 Act made it a
8  federal crime to "knowingly creates, sells, or possesses a <u>depiction</u>
9  of animal cruelty with the intention of placing that depiction in
10  interstate or foreign commerce for commercial gain," with certain
11  exemptions.  18 U.S.C. § 48 (1999) (emphasis added).

12      The Supreme Court, however, ruled § 48 to be unconstitutional in
13  <u>United States v. Stevens</u>, 559 U.S. 460 (2010).  In that animal
14  fighting video case, the Supreme Court held that § 48 was
15  substantially overbroad to include prohibition of protected speech
16  under the First Amendment.  <u>Id.</u> at 480-81.  But, after identifying
17  the "animal crush video" genre where sexualized torture and killing
18  of helpless animals are depicted and marketed and recognizing that
19  such videos were the primary focus of the 1999 enactment § 48, the
20  Court reserved the question of "whether a statute limited to crush
21  videos or other depictions of extreme animal cruelty would be
22  constitutional."  <u>Id.</u> at 482.

23      In the wake of <u>Stevens</u>, Congress passed the Animal Crush Video
24  Prohibition Act of 2010 ("ACVPA") to revise § 48 to prohibit the

25

26  _____

27      [2] The government is aware of only one other case in which a
    defendant has filed a plea agreement to animal crushing under
28  § 48(a)(1) – <u>United States v. Krystal Cherika Scott</u>, 21-49-SEB-DLP
    (S.D. Ind.).  That case is currently set for a combined guilty plea
    and sentencing hearing on November 10, 2021.

creation and distribution of "animal crush videos" whose definition now included "obscene."  In the formal findings of the 2010, Congress made explicit the tie between animal cruelty and obscenity (as defined by <u>Miller v. California</u>, 413 U.S. 15 (1973)) in the prohibition of creation and distribution of animal crush videos, while finding that the federal government has "a compelling interest in preventing intentional acts of extreme animal cruelty."  ACVPA, Pub. L. No. 111-294 (Dec. 9, 2010).  The ACVPA's revised prohibitions of creation and distribution of animal crush videos are currently set forth in §§ 48(a)(2) and (3), and the revised definition of "animal crush video" is found in § 48(f)(2).

The constitutionality of the ACVPA was challenged in the Fifth Circuit case of <u>United States v. Richards</u>, an animal crush video case involving depictions of sexual fantasies with actual killing of small animals.  755 F.3d 269 (5th Cir. 2014).  There, the Fifth Circuit held that § 48 prohibits creation and distribution of "obscene" content as defined in <u>Miller</u> "and thus by its terms proscribes only unprotected speech."   <u>Id.</u> at 276, <u>cert. denied</u>, 575 U.S. 915 (2015). To date, no other circuit has considered the constitutionality of § 48 as amended by ACVPA.

Finally, in 2019, Congress enacted the Preventing Animal Cruelty and Torture ("PACT") Act to add a new provision to § 48 to prohibit the animal crushing conduct itself and pointed to the existing definition of "animal crushing" that did not include "obscene."  Pub. L. No. 116-72 (Nov. 25, 2019).  The PACT Act's prohibition is now codified at § 48(a)(1), the provision to which defendant has pleaded guilty.  And the definition of "animal crushing" (with no reference to "obscene") is found at § 48(f)(1).

The House of Representatives floor speeches in the lead-up to the vote on the PACT Act illustrated the close connection between the prohibition of animal crushing and the creation and distribution of animal crush videos, while highlighting the differences between the underlying cruelty conduct and the video conduct.  Those statements by a bipartisan group of legislators show that the congressional intent in adding the current § 48(a)(1) was: (1) to criminalize the animal cruelty conduct connected to, but preceding and/or underlying the creation and distribution of animal crush videos, with or without the presence of videos; (2) to give federal law enforcement broader authority to combat animal cruelty conduct; (3) to give federal law enforcement ability to investigate animal cruelty conduct discovered while investigating other federal crimes; and (4) criminalize individuals conducting interstate commerce of animal breeding and sales if they engage in acts of animal cruelty.  See 165 Cong. Rec. H8356-H8358 (daily ed. Oct. 22, 2019) (statements of Reps. Deutch, Reschenthaler, Axne, Fitzpatrick, Blumenauer, Stevens).

Furthermore, the signing statement made by then-President Donald Trump highlighted the PACT Act's key purpose: "It is important that we combat these heinous and sadistic acts of cruelty, which are totally unacceptable in a civilized society."  "President Trump Signs Preventing Animal Cruelty and Torture Act, Nov. 25, 2019," available at https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-signing-ceremony-h-r-724-preventing-animal-cruelty-torture-pact-act/.

## IV.  THE PRESENTENCE INVESTIGATION REPORT

On August 30, 2021, the USPO disclosed the PSR and the USPO letter.  (Dkt. 37, 38.)  Although the PACT Act was enacted after the

1   release of the 2018 version of the Sentencing Guidelines, the USPO

2   determined that USSG Appendix A's reference to USSG § 2G3.1 for 18

3   U.S.C. § 48 still applied.  (PSR ¶ 17.)

4        Using § 2G3.1, the USPO calculated defendant's total offense

5   level, criminal history category, and Guidelines range as follows:

6        Base offense level                    10   USSG § 2G3.1(a)
         Knowing distribution of video         +2   USSG § 2G3.1(b)(1)(F)
7        Use of computer (smartphone)          +2   USSG § 2G3.1(b)(3)
         Sadistic, violent conduct             +4   USSG § 2G3.1(b)(3)
8        Acceptance of responsibility          -3   USSG § 3E1.1
         **Total offense level**               **15**
9        Criminal history category              I   (0 point)
         **Guidelines range**                  **18-24 months**

10

11  (PSR ¶¶ 17-33, 38, 67.)

12       The USPO identified defendant's offense as a Class D felony and

13  the Guidelines range for supervised release as "1 year to 3 years,"

14  but noted that the Court may impose a term of supervised release of

15  "not more than one year," which appear to contain typographical

16  errors.  (PSR ¶¶ 69, 70.)  Defendant's offense carries a statutory

17  maximum term of seven years (18 U.S.C. § 48(c)), which means the

18  offense is a Class C felony (18 U.S.C. § 3581(b)(3)) and the Court

19  may impose a supervised release term for up to three years (18 U.S.C.

20  § 3583(b)(2)).

21       In its sentencing recommendation letter, the USPO recommended an

22  upward variance to 30 months' imprisonment, followed by two years of

23  supervised release.  In support of its upward-variance request, the

24  USPO reasoned that the Guidelines account for defendant's video

25  creation and distribution conduct, but they do not account for

26  defendant's "significant aggravating nature" of displaying "sheer

27  disregard for animal life or for the egregiously violent nature of

28

7

1    [his] conduct."  (USPO letter at 5, 8.)[3]

2    **V.    THE GOVERNMENT'S SENTENCING CALCULATIONS AND RECOMMENDATIONS**

3         The government agrees with the USPO's determination of

4    defendant's total offense level of 15, criminal history category of

5    I, and applicable Guidelines range of 18-24 months.  Unlike the USPO,

6    the government does not recommend an above-Guidelines sentence, but

7    instead recommends a sentence of 24 months' imprisonment and no

8    higher (consistent with the plea agreement) and a three-year period

9    of supervised release.

10        **A.    Identification of the Correct Guidelines Calculation Method**

11        As a technical matter, the government believes that the correct

12   initial step in making defendant's Guidelines calculations is to look

13   first to USSG § 2X5.1[4] because defendant's animal crushing offense

14   "is a felony for which no guideline expressly has been promulgated."

15   USSG § 2X5.1.  Section 2G3.1 does apply to §§ 48(a)(2), (3) (creation

16

17   _____

18   [3] In the aforementioned United States v. Krystal Cherika Scott
     case, the USPO in the Southern District of Indiana also went directly
19   to USSG § 2G3.1(a) for Scott's offense of killing five dogs, five
     cats, and 11 unborn kittens primarily through strangulation and
20   beheading, which was livestreamed via video on social media
     applications.  The USPO in Scott then applied the same sentencing
21   specific offense characteristic enhancements under § 2G3.1 that the
     USPO here applied, plus an obstruction of justice enhancement under
22   USSG § 3C1.1, to reach the total offense level of 17, resulting in a
     Guidelines range of 24-30 months with criminal history category I.
23   But unlike here, the USPO in Scott did not find justification for an
     outside-the-Guidelines sentence.

24        As of the time of the filing of this memorandum, the government
     is not aware of the specific sentencing recommendation made by the
25   USPO or the government in Scott.

26   [4] USSG 2X5.1 states, "If the offense is a felony for which no
     guideline expressly has been promulgated, apply the most analogous
27   offense guideline.  If there is not a sufficiently analogous
     guideline, the provisions of 18 U.S.C. § 3553 shall control, except
28   that any guidelines and policy statements that can be applied
     meaningfully in the absence of a Chapter Two offense guideline shall
     remain applicable."

                                        8

1    and distribution of animal crush videos, defined in part as obscene

2    depictions), which comprised the entirety of § 48 when the 2018

3    version of the Guidelines was issued.  But since 2018, "no guideline

4    expressly has been promulgated" for the specific animal crushing

5    offense under § 48(a)(1) to which defendant pleaded guilty.  USSG

6    § 2X5.1.  Thus, the Court must "apply the most analogous offense

7    guideline," USSG § 2X5.1, which the government submits is § 2G3.1 as

8    the USPO has determined.  The government further agrees with the

9    USPO's subsequent application of the specific offense characteristics

10   under § 2G3.1 and the acceptance of responsibility reduction under

11   § 3E1.1 to reach the total offense level of 15 and the Guidelines

12   range of 18-24 months.

13       Alternatively, if the Court were to determine that § 2G3.1 is

14   not "the most analogous offense guideline," the Court could look to

15   the animal fighting venture guideline under USSG § 2E3.1, which has

16   the base offense level of 16 without providing for any enhancements,[5]

17   which would lead to a total offense level of 13 for defendant with

18   acceptance of responsibility, resulting in a range of 12-18 months.

19   Application Note 2 of § 2E3.1, however, provides that an upward

20   departure may be warranted where the guideline "substantially

21   understates the seriousness of the offense" beyond the typical injury

22   and death resulting from animal fighting because "the offense

23   involved extraordinary cruelty to an animal beyond the violence

24   inherent in such a venture (such as by killing an animal in a way

25   that prolongs the suffering of the animal) . . . ."  USSG § 2E3.1

26

27       [5] In 2016, the United States Sentencing Commission increased the
     base offense level of USSG § 2E3.1 from 10 to 16 to "better account[]
28   for the cruelty and violence that is characteristic of these crimes."
     81 Fed. Reg. 27,262, 27,265 (May 5, 2016).

cmt. n.2.  If the Court were to rely on § 2E3.1 (instead of § 2G3.1),
the government believes that an upward departure under USSG
§ 5K2.0(a)(2)(B) for "a circumstance that the Commission has not
identified in the guidelines but that nevertheless is relevant to
determining the appropriate sentence," or an upward variance under 18
U.S.C. § 3553(a), would be appropriate in this case, in light of the
particularly heinous and callous act of violence exhibited by
defendant that also prolonged Canelo's suffering.[6]

     If, however, the Court were to determine under § 2X5.1 that
"there is not a sufficiently analogous guideline," then the
Guidelines provide that "18 U.S.C. § 3553 shall control, except that
any guidelines and policy statements that can be applied meaningfully
in the absence of a Chapter Two offense guideline shall remain
applicable."  USSG § 2X5.1.  Even under this § 3553(a)-only
evaluation, however, the government submits that the Court should

---

[6] The statutory maximum penalty for engaging animal fighting
venture, 7 U.S.C. § 2156, is five years, 18 U.S.C. § 49, which is two
years less than the statutory maximum penalty for animal crushing.
Particularly under the pre-2016 Guidelines, courts regularly
sentenced defendants to the high end of the applicable range or even
varied or departed upward.  See, e.g., United States v. McCoy, No.
4:17-cr-40009 (C.D. Ill. Sep. 26, 2017) (sentencing defendant above
the high end (12 months) on dog fighting charge to 24 months); United
States v. Lee, 3:11-cr-30092 (S.D. Ill. Nov. 17, 2011) (same); United
States v. Jacobs, 7:12-cr-84 (E.D.N.C. Mar. 6, 2013) (varying upward
in dog fighting case to 29 months where guidelines range was 8-14
months).

     If the Court were to rely on § 2E3.1 for Guidelines
calculations, it would be well within the Court's discretion to vary
or depart upward from the 12-18 months' range to 24 months.

     In suggesting such an upward variance or departure, the
government is not also suggesting that, if the Court applies § 2G3.1,
the Court should vary or depart upward.  Nor is the government
suggesting in any way that the Court impose a sentence higher than 24
months in either case.  Consistent with the plea agreement, the
government recommends that the Court impose a sentence that is no
higher than 24 months – regardless of the Guidelines provision the
Court relies on to calculate the range.

look to the USPO's § 2G3.1 calculation as a meaningful guidepost.  If defendant's Instagram and Snapchat videos had additionally included a sexual element such that they satisfied the definition of "obscene," and defendant had pleaded guilty to a distribution offense under § 48(a)(3) instead of § 48(a)(1), § 2G3.1 would squarely apply, and the Guidelines range of 18-24 months would unquestionably be correct. Now that Congress has prohibited the animal crushing conduct itself as codified in § 48(a)(1), common sense dictates that the Guidelines would point to a higher range for the actual conduct of impaling, and causing grave injuries on, a dog than creating or distributing a video depicting the same conduct with an added feature of obscenity.

In sum, the government submits that, upon an application of § 2X5.1, the Court should find § 2G3.1 to be the most analogous provision and the starting point for determining defendant's sentence.  See United States v. Cantrell, 433 F.3d 1296, 1279 (9th Cir. 2006).  Ultimately, consistent with the plea agreement, the government recommends that the Court impose a 24-month sentence but not higher – regardless of which path the Court takes.

**B.    18 U.S.C. § 3553(a) Considerations**

Upon consideration of the § 3553(a) factors of defendant's offense, the government believes that a custodial sentence of 24 months and a three-year term of supervised release is appropriate.

### 1.   Nature and Circumstances of the Offense

The nature and circumstances of defendant's offense point to a sentence of 24 months.  See 18 U.S.C. § 3553(a)(1).  Defendant's crime was an intentional, deliberate act of sadistic cruelty that spanned more than two hours until his dog Canelo became physically nonresponsive and unrevivable.  Defendant's conduct was not one borne

of momentary rage or spontaneous burst of violence in a fit of passion.  As depicted in the videos lodged with the Court, defendant persisted in his violent acts over two hours, reveled heartlessly in exacting mortal wounds to Canelo, gave no aid to Canelo in his suffering, and cursed Canelo as he lay dying.  The extremely violent nature of defendant's crime and his heartless torture of Canelo should weigh heavily in favor of a significant sentence at the high end of the 18-24 month range that a calculation under § 2G3.1 yields.

2.   <u>History and Characteristics of Defendant</u>

Defendant's history and characteristics also point to a substantial sentence of 24 months.  <u>See</u> 18 U.S.C. § 3553(a)(1).  Defendant's deeply concerning history of uncontrolled and illegal use of controlled substances, including while released on bond in this case, possession of dangerous weapons, and demonstrated disregard for the law and public order point further toward a robust sentence to promote respect for the law, adequate deterrence, and protection from defendant's future crimes.

As the USPO notes, defendant began using marijuana at age 13 and, at age 14 or 15, methamphetamine, which has remained his drug of choice, including at the time of his instant offense.  (PSR ¶¶ 52, 53.)  Defendant has also admitted to the USPO (to his Pretrial Services Officer) that he used Xanax illegally.  (Pretrial Services Report, Apr. 26, 2021 ("PTSR").)  While under pretrial supervision in this case, defendant continued to use illegal drugs and failed to pass drug tests or to attend drug testing and counseling sessions.  (Dkt. 15, 26.)  Even while in detention at the Metropolitan Detention Center, Los Angeles ("MDC"), pending sentencing, defendant has been disciplined for fighting with another inmate on June 19, 2021 (just

five days after he was remanded to custody) and was subjected to a loss of 27 days of good conduct time if he is to receive a custodial sentence in this case.  (See Exhibit 1, "Inmate Discipline Data," dated Sept. 24, 2021, bates RAMOS_000551.)  Defendant's repeated disregard for the law and court orders, even while under court supervision and detention, are significant aggravating factors.

Moreover, although defendant, a 19-year-old, has no convictions, he has a history of possessing illegal weapons at school and having been arrested for exhibiting a firearm.  (PSR ¶¶ 40, 41.)  He still has an outstanding warrant for showing false identification to a peace officer, vandalism, and failure to obey court orders.  (PSR ¶ 40.)  On the day defendant committed the instant offense, he was in possession of a metal knuckle, an illegal weapon in California (Complaint ¶ 13(f)), while also being under the influence of drugs and having committed the brutal crime against Canelo.  After his arrest in this case, a search of defendant's phone pursuant to a federal search warrant revealed photos and videos of defendant holding what appeared to be firearms and large quantities of marijuana.

At the same time, the difficult circumstances of defendant's upbringing, his addiction, and apparent mental health concerns point to an exercise of some leniency.  As the USPO notes, when defendant was two years old, defendant's father committed suicide after struggling with heroin and methamphetamine addiction and having been incarcerated for five years.  (PSR ¶ 43.)  Thereafter, defendant's mother struggled to provide for defendant and his siblings (all older), and the family, at one point, was homeless, living out of a van; defendant reportedly was often alone.  (PSR ¶ 45.)  One of

1    defendant's siblings is currently in prison for drug and attempted

2    murder convictions; another struggles with methamphetamine addiction.

3    (PSR ¶ 46.)  As noted, defendant has used drugs illegally since age

4    13.  (PSR ¶¶ 52-54.)  Due to his drug use and fights with others,

5    defendant was expelled from high school when he was in the 11th

6    grade.  (PSR ¶ 47.)  Although defendant's MDC mental health records

7    that the government obtained and produced to the defense show that on

8    June 14 and 22, 2021, defendant was "alert and oriented," his mood

9    was "appropriate to content," his thought process was "goal

10   oriented," and he had no current mental health complaints, defendant

11   claimed during his August 11, 2021 presentence investigation

12   interview with the USPO, that he struggles with undiagnosed anxiety,

13   depression, mood swings, "racing thoughts and sadness which causes

14   him to withdraw from others."[7]  (PSR ¶ 51.)  Overall, defendant's

15   difficult and unstable upbringing and already well-established

16   history and pattern of addiction, despite his youth, are mitigating

17   factors that the Court should consider.

18       On balance, defendant's extremely violent conduct toward Canelo,

19   persistent substance abuse including during his commission of the

20   instant offense, failure to observe the law and court orders,

21   repeated possession of dangerous weapons – weighed against

22

23   _____

24       [7] On September 14, 2021, defense counsel represented to the
     Court that "a mental health expert conducting a psychological
25   evaluation" of defendant would require a continuance of the
     sentencing date.  (Dkt. 40.)  Any conclusion reached by the defense
26   mental health expert, which the government has not yet received, must
     be weighed against defendant's June 2021 mental health evaluations
27   and his own claims to the USPO in August 2021.  And any mental health
     concerns that defendant has, while they may be mitigating for
28   sentencing purposes, cannot explain or excuse his knowing,
     intentional, and deliberate conduct of sadistic violence against
     Canelo.

14

defendant's immediate acceptance of responsibility, lack of
conviction history, and difficult and unstable upbringing worsened by
drug addiction and alleged mental health concerns -- present a
compelling case for the recommended sentence of 24 months at the high
end of the Guidelines range under § 2G3.1 (but not higher) to
sufficiently reflect the seriousness of the offense, promote respect
for the law, and provide just punishment.  See 18 U.S.C.
§ 3553(a)(2)(A).

### 3.   Adequate Deterrence and Protection from Future Crimes

A substantial sentence of 24 months is appropriate also to
provide adequate specific and general deterrence and protection of
the public from defendant's future crimes.  See 18 U.S.C.
§§ 3553(a)(2)(B), (C).  As Congress has found, the federal government
has "a compelling interest in preventing intentional acts of extreme
animal cruelty."  ACVPA, Pub. L. No. 111-294.  As Representative
Haley Stevens spoke on the House floor in 2019, a key purpose of the
PACT Act is "to stop animal abuse on the front end and also stop
other forms of domestic abuse that may arise from it."  165 Cong.
Rec. H8357 (statement of Rep. Stevens).  A robust sentence of 24
months helps achieve the legislative goals of § 48(a)(1) to deter
both defendant himself and others in the community from committing
similar acts of extremely cruelty and abuse of domestic animals.

As the USPO has noted, "(although not conclusive) research has
revealed that there can be a correlation between violent acts towards
animals and violent behavior to humans."  (USPO letter at 6.)  As the
USPO quoted from a report on the connection between serial killers
and animal abusers, "Acts of cruelty to animals are not mere
indications of a minor personality flaw in the abuser; they are

15

symptomatic of a deep mental disturbance.  Research in psychology and criminology shows that people who commit acts of cruelty to animals don't stop there – many of them move on to their fellow humans." (Id. (quoting Daniel Goldman, "Experts See Parallels Between Dahmer, Previous Serial Killers," New York Times News Service, Aug. 11, 1991 ("'Murderers like this very often start out by killing and torturing animals as kids,' says Robert K. Ressler, who developed profiles of serial killers for the Federal Bureau of Investigation's behavior sciences unit.").

As other studies into the link between cruelty toward animals and behavior toward other human beings have shown, "people who abuse animals are five times more likely to commit violent crimes against humans."  Jared Squires, "The Link Between Animal Cruelty and Human Violence: Children Caught in the Middle," 8 Ky. Child. Rts. J. 2, 2 (2000).  Also, studies focusing specifically on sex offenders found that "48% of rapists and 30% of child molesters admitted to acts of animal cruelty in childhood or adolescence."  Id. at 5.  As a court discussing the same studies in a dog-fighting case observed, "The connection between animal abuse and the effect on children is undeniable, simply view a list of recent serial killers to find that generally their first victims were usually animals."  Court's Sentencing Memorandum, United States v. Berry, No. 09-CR-30101-MJR, at 17 (S.D. Ill. May 11, 2010), ECF No. 157.  See also U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention, "Animal Abuse and Youth Violence," Juvenile Justice Bulletin (Sept. 2001), available at https://www.ojp.gov/ pdffiles1/ojjdp/188677.pdf (summarizing studies suggesting that animal abuse may be characteristic of up to nearly two in three

16

violent adult offenders).  Although animal cruelty does not necessarily mean future violent behavior toward other people, the high correlation points to a need for heightened attention to deterrence, public safety, and a full term of supervision after imprisonment.

In light of the United States' compelling interest in protecting domestic animals from extreme cruelty as well as the public from the future crimes of defendant who bears a number of significant risk factors, the Court should impose a substantial sentence of 24 months, followed by a three-year term of supervised release.

In addition, the government concurs with the USPO's recommendation that a mental health evaluation and treatment condition be imposed as a special condition of supervised release. As part of that condition, the Court should also direct the USPO to consider animal cruelty specific mental health evaluation and treatment if defendant's Probation Officer finds such resources are available and helpful.  See, e.g., "Animal Cruelty Specific Evaluation," Colorado LINK Project, available at https://coloradolinkproject.com/ assessment-and-intervention/animal-cruelty-evaluation/.

### 4.   Avoiding Unwarranted Sentence Disparities

A sentence of 24 months at the high end of the Guidelines range as calculated under § 2G3.1 is reasonable and avoids unwarranted sentence disparities.  See 18 U.S.C. § 3553(a)(6).  One way courts ensure consistent sentences for similarly situated defendants across the country is by applying the Guidelines uniformly.  See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010).  Although no other person appears to have yet been sentenced under § 48(a)(1), and

17

the match between § 48(a)(1) and § 2G3.1 is not exact, the government submits that, until the Sentencing Commission sets forth a different Guidelines provision for § 48(a)(1), a high-end, within-Guidelines sentence under § 2G3.1 is prudent and reasonable and sets a precedent that would lead to avoidance of unwarranted sentence disparities. That is especially true in this case where defendant committed the egregious conduct of actual animal crushing (rather than only creation or distribution of animal crush videos), but he accepted responsibility immediately without requiring the government to indict, has no convictions, and has mitigating characteristics.  A within-Guidelines 24-month sentence under § 2G3.1 – and no higher – is thus appropriate and meets the goals of § 3553(a).

**VI.   CONCLUSION**

For the foregoing reasons, the Court should sentence defendant to 24 months' imprisonment and a three-year term of supervised release with a special condition of mental health evaluation and treatment that may include an animal abuse evaluation and treatment component as determined by the Probation Officer.

**EXHIBIT 1**

```
  LOSBM          *      INMATE DISCIPLINE DATA        *     09-24-2021
PAGE 001 OF 001 *    CHRONOLOGICAL DISCIPLINARY RECORD   *     08:03:29


REGISTER NO: 41770-509 NAME..: RAMOS-CORRALES, ANGEL
FUNCTION...: PRT      FORMAT: CHRONO    LIMIT TO ___ MOS PRIOR TO 09-24-2021


--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 3515944 - SANCTIONED INCIDENT DATE/TIME: 06-19-2021 0730
DHO HEARING DATE/TIME: 06-24-2021 1010         DHO REPT DEL: 06-30-2021 0730
FACL/CHAIRPERSON.....: LOS/R. ALI
REPORT REMARKS.......: HE DENIED CHARGE AND STATED HE DID NOT FIGHT THE OTHER
                       INMATE. DECISION BASED ON GREATER WEIGHT OF EVIDENCE.
   201  FIGHTING WITH ANOTHER PERSON - FREQ: 1
        DIS GCT   / 27 DAYS / CS
        COMP:000 LAW:    IF INMATE RECEIVES FEDERAL SENTENCE AND EARNS
                         GOOD CONDUCT TIME DISALLOW 27 DAYS.
        DS        / 15 DAYS / CS
                     FROM: 06-24-2021  THRU: 07-08-2021
        COMP:   LAW:
        DS        / 15 DAYS / CS / SUSPENDED 90 DAYS
        COMP:    LAW:   15 DAYS OF DISCIPLINARY SEGREGATION SUSPENDED
                        PENDING 90 DAYS OF CLEAR CONDUCT.
        LP EMAIL  / 3 MONTHS / CS
                     FROM: 06-24-2021  THRU: 09-23-2021
        COMP:   LAW:
```

```
  G0005          TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

RAMOS_000551